1

2

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

3

ASA JAVON BROWN,

Case No. 2:21-cv-01396-GMN-MDC

4

Petitioner,

5

v.

6

RONALD OLIVER, et al.,[1]

7

Respondents.

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254**

**[ECF No. 23]**

8

9

10

11

12

13

14

15

Petitioner Asa Brown, a Nevada prisoner who is serving a life sentence with parole eligibility for Second-Degree Murder with Use of a Deadly Weapon, has filed a counseled First Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 23 ("Petition")). This matter is before the Court for adjudication of the merits of the remaining grounds in the Petition, which allege that Brown's trial counsel was ineffective for failing to (1) investigate and inform the trial court about allegations of jury bias due to an extraneous influence and request a mistrial on that bias, and (2) challenge the self-defense jury instructions. (*Id.*) For the reasons discussed below, the Court denies the Petition, and it denies a certificate of appealability.

16

## I.    BACKGROUND

17

### A.  Factual Background[2]

18

19

20

21

Brown's conviction stems from an altercation that happened between him and victim Jessie Bush when he attempted to purchase marijuana from someone at Bush's apartment complex in Las Vegas, Nevada, on September 9, 2016. Brown lived about two blocks away with his parents at the Country Club Towers. (ECF No. 36-2 at 20). Brown's father recently died unexpectedly,

22

23

24

[1] The Nevada Department of Corrections inmate database states that Brown is incarcerated at Southern Desert Correctional Center. Ronald Oliver is the current warden for that facility. At the end of this order, this Court kindly directs the Clerk of Court to substitute Ronald Oliver for Respondent Calvin Johnson. *See* Fed. R. Civ. P. 25(d).

25

[2] This summary is merely a backdrop to the Court's consideration of the issues presented in the Petition and should not be construed as credibility or factual findings.

and his mother was struggling coping, so she asked Brown to buy her marijuana. (*Id.* at 20, 35). Brown agreed but worried that his mother would harm herself, so he took his father's gun with him to remove it from her presence and have "a piece of [his] dad" with him. (*Id.* at 21). Brown placed the gun, which was in a zippered case, in his backpack. (*Id.* at 22).

Brown walked about two blocks to an apartment complex located at 1112 Sierra Vista in what he felt was not a "very good neighborhood" hoping to purchase $5 of marijuana from Lee Thomas, whom he knew as Youngster. (*Id.* at 21–22 & 25; ECF No. 35-3 at 32). As Brown walked through the complex's courtyard and up the stairs to Thomas's second-floor apartment, he passed Bush and two other residents—Lisa Templeton and Monique Monroe—who were sitting in chairs on the landing outside their apartments. (ECF Nos. 35-3 at 32, 36, 38, 67, 68; 36-2 at 25).

Templeton considered Bush to be family because she dated his brother for over eight years. (ECF No. 35-3 at 44). She was afraid of Bush's family but not Bush himself. (*Id.* at 45). Monroe is Thomas's mother and was living with him at the time. (*Id.* at 68). Bush "was in a sad mood" and having a "bad day" believing that he was going to get evicted. (*Id.* at 68, 82).

Brown did not purchase marijuana from Thomas. (ECF No. 36-2 at 26; *accord* ECF Nos. 35-3 at 70 & 39–40). As Brown walked down the stairs, Bush asked for $5 that he claimed Brown owed him. (ECF No. 35-3 at 70). Brown denied owing Bush money and said the money he had wasn't his anyway. (ECF No. 36-2 at 27). Bush, who had followed Brown down the stairs to the courtyard, smacked Brown in the face. (ECF Nos. 35-3 at 71; *accord* ECF No. 36-2 at 27).

Templeton and Monroe saw Brown leave through the complex's back gate, which locked from the outside, (ECF No. 36-1 at 50), and return several minutes later through the complex's front gate with a gun that Brown immediately started shooting at Bush without any words exchanged between them. (ECF No. 35-3 at 41–43, 48, 72–74). Brown fired multiple rounds and one struck Bush—who was then seated—in the chest. (ECF No. 35-3 at 44, 77–78). Monroe grabbed a t-shirt and handed it to Thomas who applied pressure to the wound and called 9-1-1. (*Id.*

at 79).  A patrol officer arrived, and paramedics took Bush to the hospital where he was pronounced dead from a gunshot wound to the chest. (*Id.* at 120; ECF No. 36-1 at 16).

Physical evidence recovered at the scene indicated that two shots were fired near the complex's front gate; shots hit at or below the balcony where Bush, Templeton, and Monroe were conversing; and two live rounds were ejected, and one shot was fired in the courtyard. (ECF Nos. 35-3 at 137–174; 36-1 at 39–60).  According to police measurements, an individual traveling from the complex's back gate to the front gate would traverse 219 feet, and that was the only way to access the courtyard after leaving from the back gate without jumping walls or having a key for the locked back gate. (ECF No. 36-1 at 50–53).

The medical examiner determined that Bush had twice the legal limit of alcohol, active marijuana and breakdown product from that substance, and phencyclidine or PCP in his system at the time of death. (ECF No. 36-1 at 17).  Brown's forensic toxicologist testified that the drug combination made Bush "like a short fuse or a bomb waiting to go off . . . ." (ECF No. 36-3 at 16).  But witnesses did not see any weapons on Bush, and none were found at the scene or hospital. (*See generally* ECF No. 35-3).  Bush had no acute injuries except the gunshot wound. (ECF No. 36-1 at 10).  Neither witness heard Bush argue with Brown or shout obscenities at him. (ECF No. 35-3 at 40–43 & 71–74).  And they didn't see Bush reach like he had a gun. (*Id.* at 41 & 72).

Brown testified in his own defense, telling a different story than Templeton and Monroe.  Brown knew from conversations he'd had with Bush and overheard between Bush and others that Bush had a grim reaper tattoo on his shoulder, a criminal record, and was a proud killer and bully. (ECF No. 36-2 at 24–25).  Brown thought that Bush was acting "out of his mind[,]" "seemed really mad[,]" and "wasn't normal" that day. (*Id.* at 26).  After Brown deflected Bush's demand for $5, Bush shouted obscenities at Brown and smacked his face hard enough to draw blood. (*Id.* at 27).  Brown then dropped his backpack and raised his hands "ready to fight." (*Id.*)  But Bush stepped back and put "his hand behind his back and reached for" what Brown assumed was a gun. (*Id.*)

Brown picked up his bag and slowly walked away from Bush who said, "Mother fucker, I see you again, I will kill you." (*Id.* at 28). Brown walked toward the back gate but didn't escape that way because he "didn't want to be in the alley. It's not a safe place after somebody just threatened your life." (*Id.* at 30). Instead, Brown opened his backpack, took out the gun, removed the gun from its zippered case, put the clip in, loaded it, and walked toward the courtyard. (*Id.*)

When Brown reached the courtyard Bush, who was "sitting at the top of [the] stairs talking," said: "Didn't I say, mother fucker, again I don't want to see you, next time I see you I'll kill you." (*Id.* at 31). Wanting to quash the dispute, Brown approached with the gun at his side and asked Bush, "Did you just threaten to kill me . . . ." (*Id.* at 32). Bush then stood up and put his hand behind his back like he was reaching for a gun. (*Id.*) Scared, Brown "fired three shots" as he was moving backwards toward the front gate and fled from the scene and left the State. (*Id.* at 33).

**B. Procedural Background**

In September 2017 following a five-day trial, a jury in Nevada's Eighth Judicial District Court convicted Brown of Second-Degree Murder with Use of a Deadly Weapon. (ECF No. 37-2). The Nevada Court of Appeals ("NCA") affirmed Brown's conviction. (ECF No. 38-22). And remittitur issued on December 3, 2018. (ECF No. 38-24).

Brown filed a *pro se* post-conviction habeas petition in state court. (ECF No. 38-30). The state district court denied the petition on the briefs, (ECF No. 40-5), and Brown appealed. (ECF No. 40-10). NCA affirmed, (ECF Nos. 40-21), the Nevada Supreme Court denied Brown's petition for review, (ECF No. 40-23), and remittitur issued on May 10, 2021. (ECF No. 40-24).

Brown transmitted his original federal habeas petition in July 2021. (ECF No. 1-1). This Court appointed the Federal Public Defender ("FPD") to represent Brown. (ECF No. 6). FPD filed Brown's operative Petition, which asserts three grounds for relief: (1) trial counsel was ineffective for failing to (A) request a mistrial due to jury bias, and (B) challenge the self-defense jury instructions; and (2) the trial court violated Brown's right to an impartial jury.

(ECF No. 23). Brown moved to conduct discovery and for a protective order for juror information. (ECF No. 24). Respondents moved to dismiss the Petition as untimely and argued that all grounds were unexhausted. (ECF No. 42).

This Court denied Brown's discovery motion and granted Respondents' dismissal motion in part, dismissing Ground 2 as procedurally defaulted. (ECF No. 58 at 16). And it deferred a decision on whether Brown can demonstrate cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1 (2012), for Ground 1(B) until after the parties have answered and replied. (*Id.*) Respondents answered as to Grounds 1(A) and 1(B) and reasserted their procedural-default argument as to Ground 1(B). (ECF No. 62). Brown replied on August 7, 2024. (ECF No. 64).

## II.    GOVERNING STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Under § 2254(d)(1)'s first clause, a state court decision is contrary to clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if the state court decides a case differently than the Supreme Court on "a set of facts that are materially indistinguishable" from the Supreme Court's case. *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (cleaned up) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). Under § 2254(d)(1)'s second clause, a state court decision is an unreasonable application of clearly established Supreme Court precedent

"if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (cleaned up) (quoting *Williams*, 529 U.S. at 413).

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "Instead, § 2254(d)(2) requires that [federal habeas courts] accord the state trial court substantial deference." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). Thus, "if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Id.* (cleaned up) (quoting *Wood*, 558 U.S. at 301; and *Rice v. Collins,* 546 U.S. 333, 341–42 (2006)). "This is a daunting standard—one that will be satisfied in relatively few cases." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *overruled on other grounds by Cullen v. Pinholster*, 563 U.S. 170, 185 (2011). But it is met "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Id.* at 1001 (citing *Wiggins v. Smith*, 539 U.S. 510, 526–30 (2003); and *Hall v. Director of Corr.*, 343 F.3d 976, 983 (9th Cir. 2003)).

## III. DISCUSSION

### A. Ground 1(A)—trial counsel ineffectiveness on possible jury bias

In Ground 1(A), Brown alleges that his trial counsel was ineffective for failing to inform the trial court about a trial attendee's report of possible jury bias from an extraneous influence, investigate that report, and request a mistrial for jury bias. (ECF No. 23 at 7–12.)

#### 1. Background

On the third day of trial during recess outside the jury's presence, Brown's trial counsel informed the trial court that they had observed audience members shaking their heads and making

threatening eye gestures. (ECF No. 35-3 at 92–93).[3]  The court hadn't seen the conduct that trial counsel mentioned, but warned the audience to maintain appropriate behavior "or risk being excused." (*Id.* at 93).  The court took a lunch recess after Monroe's testimony, admonishing the jury panel must not:

> talk or converse among yourselves or with anyone else on any subject connected with the trial or read, watch, or listen to any report or commentary on the trial by any medium of information, including without limitation newspapers, television, the Internet, and radio and you cannot form or express any opinion on any subject connected with this case 'til it's finally submitted to you. And, again, no legal research, factual research, no social media communication, and you cannot do any type of investigation or recreation of testimony on your own.

(ECF No. 35-3 at 98–99).  The court had admonished the jury panel with nearly identical language on at least four prior occasions. (ECF Nos. 35-2 at 35 & 48; 35-3 at 21 & 89).  The court continued to admonish the jury in a near identical manner through the rest of trial. (*See, e.g.*, ECF Nos. 35-3 at 174 & 199; 36-1 at 63 & 98; 36-2 at 5 & 55).  The court gave the same admonishment to the venire before the jury was chosen. (ECF No. 34-5 at 202).

After the break the court, prosecutor, and trial counsel spoke outside the presence of the jury about an incident that happened during lunch. (ECF No. 35-3 at 101).  The prosecutor explained that as he was crossing the street "at the south end of the courthouse [he] heard some commotion to the north end of the courthouse" but didn't think much of it until he received "a text indicating that one of [the State's] witnesses had been struck by a vehicle out in front of the courthouse at the north end." (*Id.* at 101–102).  The prosecutor met with officials from the Las Vegas Metropolitan Police Department and learned the victim's sister, Queva Staford, had been struck by a car registered to Brown's mother, Shaquella Brown. (*Id.* at 102).  Witnesses believed the incident was "purposeful." (*Id.*)

---

[3] Brown was represented in his state criminal case by attorneys Ryan Helmick, Jack Buchanan, and Telia Williams. (ECF No. 23 at 5).  Unless otherwise stated, this Court collectively and individually refers to them as "trial counsel."

Page 7 of 29

The court's marshal heard radio traffic indicating "that the victim's relative had been struck by a car allegedly driven by the defendant's mom" who then fled. (*Id.*)  Queva was possibly transported to the hospital by ambulance; the police had no one to question and were actively searching for the participants. (*Id.* at 103).   Trial counsel stated they'd heard there was a confrontation that happened before the traffic incident, possibly outside the courtroom. (*Id.* at 103–04).  Trial counsel's main concern was "the jury." (*Id.* at 104).  Especially because the prosecutor thought it possible some jurors had discussed the incident. (*Id.*)

Trial counsel surmised that, given the "unique situation[,]" it "may garner national news if not local news" that evening. (*Id.*)  They expressed concern that, if "one juror at any point in time even suggest the fact that the defendant's mom is now accused of some sort of battery, use of a deadly weapon or something else, against the victim [sic][,]" how the jury could be instructed to ignore that. (*Id.*)  But trial counsel expressed that maybe the jury didn't know because "they were all up here" when trial counsel arrived at the courtroom. (*Id.*)

In response to trial counsel's suggestion of polling the jury one-at-a-time or "as a whole[,]" the court stated:

> I mean, I can just generically bring them all in and ask did anybody witness any events that occurred outside, you know, during the lunch hour. I can even say that dealt with anybody being struck by a car without saying it related to anybody involved in the case and then if anybody raises their hand about that, we can bring them in individually and just say what did you see, you know, *et cetera*.

(*Id.* at 105).  They all discussed and agreed that was the best course of action. (*Id.* at 105–06).  The court generically questioned the jury panel as discussed, learning that a couple of jurors saw that the area had been roped off and Juror 4 overheard someone discuss the incident:

> THE COURT: You all can be seated. Thank you. So before we get started I was told by the marshals that there may have been some type of car-pedestrian accident outside the courthouse while we were in our lunch recess. And it would have been on the north end of the courthouse, right in the area where a lot of times jurors leave and go to lunch and walk across the street in that area. Did anybody -- and that the police responded to that.

Page 8 of 29

Did anybody witness that? Did anybody talk to anybody about that? Anything? Let's start with did anybody see any -- any car accident or anything? Nope? Did anybody come upon the car accident afterwards? Or were you guys, like, in a different area, I guess? So nobody saw –

UNIDENTIFIED JUROR: I saw the taping off, but I didn't see anything happen.

THE COURT: Okay.

UNIDENTIFIED JUROR: This was coming back from lunch.

THE COURT: Okay. Anybody else?

UNIDENTIFIED JUROR: Same thing.

THE COURT: Same thing? You saw -- so all of you are just basically saying as you were coming back from lunch you saw an area had that had been –

UNIDENTIFIED JUROR: Yes.

THE COURT: Kind of taped off by police to keep people out of that area?

UNIDENTIFIED JUROR: And an ambulance.

THE COURT: All right. Anybody say anything? And you don't have to tell me what was said right now, but did anybody talk to anybody about any of that?

JUROR NO. 4: I just heard somebody –

THE RECORDER: What juror number?

THE COURT: Okay. Hold on, hold on. Don't tell me anything that was said.

JUROR NO. 4: Okay.

THE COURT: Just did you talk to a police officer? "Yes" or no"?

JUROR NO. 4: No.

THE COURT: Did you talk to other people that may have seen something?

JUROR NO. 4: No.

THE COURT: Did you talk to other jurors?

JUROR NO. 4: No.

THE COURT: Okay. So now you can tell me, who did you talk to?

JUROR NO. 4: Yeah, it was just I heard somebody outside describing what happened and –

THE COURT: Okay. All right. So hold on, hold on. And, I'm sorry, I'm not trying to be rude.

JUROR NO. 4: No, that's all right.

THE COURT: Anybody else talk to anybody or hear any people describing what it was that happened?

UNIDENTIFIED JUROR: No.

THE COURT: No? Okay. I tell you what, why don't you guys go ahead and step outside for a second.

And, [Juror 4], just stay where you are. Okay?

JUROR NO. 4: Okay. No problem.

THE COURT: Nobody – you're not in trouble or anything. We're just trying to make sure that nothing happened that causes any problems.

(*Id.* at 108–110).

The court excused the other jurors and questioned Juror 4, learning he'd overheard a prospective juror for another trial tell others that the person driving the car seemed to purposefully hit the pedestrian:

THE COURT: And I apologize. I wasn't trying to be rude by interrupting you. I was just trying to get at whether anybody saw or heard anything and then we would wait and talk to you now. So what was it that your -- well, let's start with this, you went to lunch and you were coming back to the courthouse?

JUROR NO. 4: Actually, I just saw it was roped off.

THE COURT: Okay.

JUROR NO. 4: So I came around the back entrance.

THE COURT: Okay.

JUROR NO. 4: As I was sitting out here, waiting to come back in somebody was describing what happened to other jury selection people because they were going to another room and basically one person there said he saw the whole thing.

Page 10 of 29

THE COURT: Okay.

JUROR NO. 4: So that's what he was describing to the crowd around him.

THE COURT: Okay. And the person that was describing what had happened was involved in this case or no?

JUROR NO. 4: He just -- he wasn't involved in this case, no. He was in one of the jury selections that were taking place.

THE COURT: Got it. So appeared to be another prospective juror?

JUROR NO. 4: Prospective, yes.

THE COURT: Okay. Telling –

JUROR NO. 4: He [was] wearing the badges that we wore the other day.

THE COURT: Got it. So he's telling the other people in his panel, hey, I saw something happen downstairs?

JUROR NO. 4: Yeah. He was kind of telling them and whoever else was sitting around him could hear what he was saying, so.

THE COURT: Okay. And what was it that you heard him saying to those folks?

JUROR NO. 4: He basically was saying that the people were arguing in the street, the guy -- not a guy, but the person who was driving turned the car around, came back, hit the person. The person landed on the windshield, landed on the concrete, was able to make it up the stairs, and then the other car, you know, the car that hit the person took off.

THE COURT: Got it. Okay. Okay. Thank you very much.

JUROR NO. 4: Sure.

THE COURT: Mr. Pesci, do you have any questions for [Juror 4]?

[PROSECUTOR]: No, thank you very much.

THE COURT: Gentlemen?

[TRIAL COUNSEL HELMICK]: No, Your Honor.

[TRIAL COUNSEL BUCHANAN]: No, Your Honor.

(*Id.* at 110–12).

The court and trial counsel agreed it did not appear that Juror 4 overheard that the incident

involved anyone from Brown's case, and the court and the attorneys strategized how to keep the jury from being tainted:

> THE COURT: So it's a – it's a fine line between saying do you think it was anybody involved in this case or not. I do not get the impression from him that he had any sense of what he was overhearing that it involved anybody in our case, just another juror telling people in that panel, hey, there was an accident outside and you know this happened.

> [TRIAL COUNSEL HELMICK]: I agree.

> * * *

> [TRIAL COUNSEL BUCHANAN]: It sounds to me, and I think Mr. Helmick and Ms. Williams concur, that it's [sic] seems like no one was pretty tainted by this -- at this juncture. But I, you know, I'm just cautious moving forward looking down the line.

(*Id.* at 112–13).   To protect the jury against exposure, the court admonished the venire of prospective jurors for another trial against discussing the incident where jurors in Brown's case could overhear, like the shared hallway:

> THE COURT: Okay. So it's Judge Earley picking a trial right now and she let me talk to her jurors and there were a couple of them that raised their hands about, yeah, I know what you're talking about. So I admonished them, please do not discuss anything about it while you're out in the hallway so that my jurors don't overhear anything that that those jurors may be talking about because they're still in the process of selecting, so they've probably got about 40 people in there. I think it may be a civil trial. Okay. Does anybody have anything further?

(*Id.* at 114).

Trial proceedings continued and the incident was not broached again until after the jury was excused for the day.   At that point, trial counsel noted media reports were not indicating the incident was a random act and the *Las Vegas Review-Journal* had an article about the matter that included Brown's picture. (*Id.* at 203).   Trial counsel expressed concern that the matter was "clearly associated with this trial" and made a record about the media reports so the court was aware "whether or not a juror ends up getting tainted with that later . . . ." (*Id.*)   Trial counsel "hope[d] that maybe a juror would bring that to our attention—should they become aware of that." (*Id.* at 203–04).   "But I'm just making a record that, clearly, the newspaper articles and the media

frenzy, if you will, regarding this incident is clearly connecting the dots, so to speak." (*Id.* at 204). Trial counsel, however, acknowledged that the jurors had been questioned, and he was "satisfied with that, with what we did there. I don't think we have to do it every day." (*Id.*)

Trial counsel reiterated that the defense "[c]ertainly don't want to do that. They'd probably pick up on that. They're a pretty smart jury, I think." (*Id.*) The court assured trial counsel it would not question the jury each day like it had earlier, and it reminded the attorneys that media coverage is nothing new for trial:

> So here's the thing, I mean, this, you know, because of this issue, has become not unlike thousands of other trials that occur that have a lot of media attention and they're oftentimes, I mean, there's cameras in the courtroom, so every day has a picture of the parties involved in the case and it doesn't just talk about what happened that day. Usually at the end of the article there's, you know, a little bit about what the history of it was.
>
> So can't really stop that, I think, whether it's David or anybody else, I think, you know, I've never had any experience with the *Review-Journal* or any other media entity, at least in my cases as an attorney, as a judge, doing anything that I thought it was inappropriate or unfair or biased in their reporting. But that's why we tell the jury what we do. And I, kind of, tried to emphasize that a little more at that last, you know, when I sent them home.
>
> But I don't think you want to go really, really, really, really, really don't watch the media, because you're right then all of a sudden somebody starts thinking, wait a minute, there's something in the media that I need to be looking out for.

(*Id.* at 205).

After trial counsel again expressed concern that Brown gets a fair trial, the court recommended that trial counsel ask if they felt a more explicit question seemed appropriate:

> No, I get it. If it gets to a point where, you know, oftentimes in cases where there are cameras in the court room and, obviously, the jury knows that it's being recorded in some fashion, the media has interest in it, there may be occasions during the trial where you ask more explicitly, has anybody watched anything, heard anything about the case, just checking in.

(*Id.*) Trial counsel responded, "[t]hat'll probably only happen if something's brought to my attention." (*Id.* at 206). The prosecutor and trial counsel then discussed mutual accusations that Bush's supporters in the audience were silently threatening Brown and his supporters before the

lunch break and Brown's supporters were doing the same to Bush's. (*Id.* at 206–10). The court and trial counsel both believed, however, that no one from either side had returned after lunch. (*Id.* at 208). And on the fourth day of trial in the afternoon the court confirmed to the jury that media was present in the courtroom and "welcome" "just like the public is[,]" but assured the jurors that, just like the courtroom recording system, they would "never be placed on camera . . . ." (ECF No. 36-1 at 4).

The traffic incident was not mentioned again until Brown raised it as a ground for relief in his state post-conviction petition and included a declaration from Theresa Diamond, who had submitted a character reference in Brown's support for sentencing. (ECF No. 37-12 at 18). Diamond explained in her character letter that she knew Brown for two years because he was dating her daughter. (*Id.*) She offered kind and specific examples about Brown's good character in that letter. (*Id.*) In relevant part, Diamond's handwritten affidavit for Brown's post-conviction state petition states:

> I witnessed several conversations in the hall of the courtroom held by jury members after an incident involving Asa Brown's mother during lunch recess. Asa's mother during that time was involved in a hit-and-run accident involving the sister of the deceased Mr. Bush that Asa was on trial for that took place right outside of the courthouse as I stood on the stairs. When I returned upstairs and waited in the hall I saw and heard some of the jury talking about what happened and making comment about Asa Brown and his mother. One male juror was sharing the car information with other jurors as he guided them to the window to show where it had taken place and how the police had the street taped off. While telling them he heard it was the defendant's mother he said "it shows the apple don't fall far from the tree." Another juror at the window (female) said "he must be like his mother!" There was other things said about Mr. Brown by the group of them as they was returning back to their line. They continued to talk about it with each other as I walked away. I went looking for Mr. Brown's attorney and saw Mrs. Telia Williams and Ryan coming back and I stopped both of them and told them what I just heard and the actions of the jury and I secretly pointed out to them the two jurors that made the negative comments about Mr. Brown and his mom. I told them what I do know about the law with having a degree in criminal justice. I know that with these comments there's no way the jury can be fair and has already convicted him based on his mother's actions. I was very upset and Ryan said "It will be taken care of" as he walked into the courtroom. Mrs. Williams walked me to the end I thought to discuss it further only to find her total interest was what took place with Asa's mom after I told them I was standing outside on the steps and saw the entire thing, while standing at the end of the hall she continuously asked me if I would be willing to

testify on Asa's mom's behalf and I said "No" because I didn't want to put my family in any danger and that my focus and support was totally for Asa. I tried several times to get answers about what would happen with the jurors that made the comments as I showed my concern that they already have Asa convicted, but Mrs. Williams only gave me the answer that she was sitting second or third chair . . . and that Ryan was the lead who was taking none of her input or advice into consideration.

(ECF No. 38-30 at 26–28).  Diamond listened and watched trial each day to see if anything would be done about the jurors she identified as speaking against Brown and his mother. (*Id.* at 29).

### 2. State court determination

In affirming the state court's denial of Brown's post-conviction petition, NCA held:

To demonstrate ineffective assistance of trial counsel, a petitioner must show counsel's performance was deficient in that it fell below an objective standard of reasonableness and prejudice resulted in that there was a reasonable probability of a different outcome absent counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Warden v. Lyons*, 100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland*). Both components of the inquiry must be shown. *Strickland*, 466 U.S. at 687. We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

* * *

Fourth, Brown argued his trial counsel was ineffective for failing to request a mistrial after his mother was involved in a traffic accident with the victim's sister near the courthouse. Brown contended jurors could have been aware of the accident and asserted counsel should have presented information to the trial court demonstrating that the jurors were overheard discussing the accident.

Following the traffic accident, the trial court questioned the jurors regarding their knowledge of that incident. Only one juror was aware of it but did not know that it involved persons interested in Brown's trial. Following questioning of the jurors, Brown's counsel informed the trial court that he did not believe any of the jurors had been tainted by the accident and did not believe any further action was necessary. The trial court subsequently admonished the jurors not to talk amongst themselves or anyone else about any subjects related to Brown's trial.

In light of the circumstances in this case, Brown failed to demonstrate counsel's actions fell below an objective standard of reasonableness. *See Ford v. State,* 105 Nev. 850, 853, 784 P.2d 951, 953 (1989) ("Tactical decisions are virtually unchallengeable absent extraordinary circumstances."). Moreover, the trial court questioned the jurors regarding their knowledge of the accident and the jurors stated they were unaware it concerned Brown. The trial court also admonished the jurors not to engage in discussions regarding any matter related to Brown's trial, and jurors are presumed to follow the court's instructions, *see McConnell v. State,* 120

Page 15 of 29

Nev. 1043, 1062, 102 P.3d 606, 619 (2004). Given the record regarding this issue, Brown failed to demonstrate a reasonable probability of a different outcome had counsel moved for a mistrial or attempted to demonstrate that the jurors were aware of the traffic accident. Therefore, we conclude the district court did not err by denying this claim.

(ECF No. 40-21 at 2–3 & 5–6).

### 3. Analysis

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analyzing ineffective-assistance-of-counsel claims that requires the petitioner to demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness" "under prevailing professional norms" and (2) the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688 & 694 (1984). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700. "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696.

A federal habeas court's "scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Under the prejudice prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The standards created by *Strickland* and [AEDPA] are both highly deferential, and when the two apply in tandem, review is 'doubly' so . . . ." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (cleaned up). Thus, "[w]hen [AEDPA] applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

According to Diamond's affidavit, she told trial counsel she'd overheard jurors discussing the traffic incident involving Brown's mother and Bush's sister after it happened, and two jurors made negative comments about Brown based on the incident. The record shows that right after Diamond allegedly shared this information with trial counsel, the trial court, prosecutor, and trial counsel met and discussed how best to determine whether and to what extent the jury knew about the traffic incident. Trial counsel did not tell the trial court about Diamond's allegations specifically. Nonetheless, they raised the issue of possible jury bias arising from the traffic incident with the court. Trial counsel informed the trial court they'd heard about a possible confrontation inside the courthouse, maybe outside the courtroom, that preceded the traffic incident. Trial counsel also informed the trial court they'd heard from the prosecutor that potentially some jurors had discussed the incident.

The trial court immediately held a hearing in which it questioned the jury about the traffic incident after it happened. Representatives of both sides were present at this hearing and permitted to ask questions but elected not to do so. The trial court's questioning revealed that no juror saw the incident or spoke to anyone about it. Two jurors saw a roped-off area and an ambulance. And one of those jurors, Juror 4, overheard a prospective juror for another trial discuss what he saw.

Juror 4 was questioned outside the presence of the other jurors. Juror 4 explained that the prospective juror had simply relayed general information about the incident: people were fighting outside the courthouse and a person in a car appeared to have purposefully struck a pedestrian and fled. At the conclusion of the hearing, the trial court and trial counsel were satisfied that Juror 4 had not sensed that the incident involved people associated with Brown's case, and that "no one was pretty tainted" by the incident.

As noted above, NCA determined that Brown's Sixth Amendment right to counsel was not violated when his trial counsel failed to inform the trial court about Diamond's verbal statements that jurors were overheard discussing the incident and request a mistrial. In so holding, NCA

1    correctly applied *Strickland* and found that trial counsel had made tactical decisions when

2    addressing the traffic incident that are not objectively unreasonable, and that Brown had not shown

3    prejudice.  Brown argues these determinations are contrary to, or involve an unreasonable

4    application of, *Mattox v. United States*, 146 U.S. 140 (1892), *superseded by rule as stated in Pena-*

5    *Rodriguez v. Colo.*, 580 U.S. 206 (2017); and *Remmer v. United States*, 347 U.S. 227 (1954). (ECF

6    No. 64 at 8–10).  Specifically, Brown argues that, under *Mattox* and *Remmer*, had trial counsel

7    informed the trial court about Diamond's allegations of jury bias, then the trial court would have

8    presumed prejudice and held a hearing in which the State needed to demonstrate the contact was

9    harmless to avoid a mistrial. (*Id.* at 12–15).  Brown also argues the NCA's determinations are

10   objectively unreasonable under § 2254(d)(2) because that court called the traffic incident an

11   accident, not a crime. (*Id.* at 10–11).  This Court rejects both challenges.

                        **a.   28 U.S.C. § 2254(d)(1)**

13         The Supreme Court explained in *Premo v. Moore* that a state court's denial of habeas relief

14   on a claim of ineffective assistance of trial counsel must be evaluated under "the *Strickland*

15   standard of effectiveness." 562 U.S. 115, 127–28 (2011) (holding "[a] state-court adjudication of

16   the performance of counsel under the Sixth Amendment cannot be 'contrary to' [*Arizona v.*

17   *Fulminante*, 499 U.S. 279 (1991)], for *Fulminante*—which involved the admission of an

18   involuntary confession in violation of the Fifth Amendment—says nothing about the *Strickland*

19   standard of effectiveness"); *accord Walker v. Martel*, 709 F.3d 925, 940 (9th Cir. 2013)

20   (explaining "[t]he lesson of *Premo* is that *Strickland* bears its own distinct substantive standard for

21   a constitutional violation; it does not merely borrow or incorporate other tests for constitutional

22   error and prejudice").  Brown's reliance on *Mattox* and *Remmer* is misplaced because neither case

23   concerns ineffective assistance of counsel.  Rather, both concern what due process requires from

24   courts when allegations of jury bias arise. *Mattox*, 146 U.S. at 142 & 149–51 (holding trial court

25   erred by refusing to consider jurors' affidavits of improper contact by outside sources and denying

the defendant's motion for a new trial, explaining that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear"); *Remmer*, 347 U.S. at 228–230 (holding it was error for the trial court to "decide and take final action ex parte on information" about an outside third party possibly offering to bribe a juror to return a verdict for the defendant but should instead "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate").

As noted above, Ground 1(A) is an ineffective-assistance-of-counsel claim for the failure to raise allegations of jury bias and move for mistrial on that basis.[4]  So, the clearly established Supreme Court law for this claim is *Strickland* and its progeny.  But even if this Court could engraft the *Mattox-Remmer* prejudice standard onto this ineffective-assistance-of-counsel claim, it would reject Brown's argument nonetheless.

The Sixth Amendment right to a jury trial, made applicable to the States by the Fourteenth Amendment, *Duncan v. State of La.*, 391 U.S. 145, 149 (1968), "guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (cleaned up).  "The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Id.* (collecting cases).  "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  The Supreme Court "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual

---

[4] In fact, Brown argued in Ground 2 that the trial court violated his right to an impartial jury by failing to question each juror individually about the traffic incident, (ECF No. 23 at 14), and this Court dismissed that claim because it was procedurally defaulted. (ECF No. 58 at 11–12).

bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982) (discussing *Remmer*, 347 U.S. 227; *Dennis v. United States*, 339 U.S. 162 (1950); and *Chandler v. Fla.*, 449 U.S. 560 (1981)).[5]

These authorities do not discuss whether trial counsel's failure to raise specific allegations of jury bias or move for a new trial on that basis is ineffective assistance. Nor do they require that courts presume prejudice simply because allegations of juror bias arise. They establish a procedure for courts to employ when those allegations arise. And as NCA correctly recounted, (ECF No. 40-21 at 5), when faced with the possibility of an extraneous influence on the jury, the state court afforded Brown precisely what these authorities—and thus due process and the Sixth Amendment—require: it "'determine[d] the circumstances, the impact thereof upon the jur[y], and whether or not they were prejudicial, in a hearing with all interested parties permitted to participate.'" *See Smith*, 455 U.S. at 216 (cleaned up) (quoting *Remmer*, 347 U.S. at 230). Accordingly, this Court finds that NCA's rejection of Brown's ineffective-assistance claim about possible jury bias is not contrary to, or based on an unreasonable application of, clearly established Supreme Court law under § 2254(d)(1).

### b. 28 U.S.C. § 2254(d)(2)

As for Brown's § 2254(d)(2) argument, NCA did not decide whether or not what happened between Brown's mother and Bush's sister during trial was, in fact, a crime. It didn't need to. Rather, it simply used the term "accident" when referring to that event in affirming the denial of Brown's state post-conviction petition. This was a reasonable choice of words.

---

[5] The Ninth Circuit has held the *Mattox-Remmer* "two-step framework" is clearly established Supreme Court law governing "allegations of improper contact between a juror and an outside party . . . ." *Godoy v. Spearman*, 861 F.3d 956, 959 (9th Cir. 2017). "At step one, the court asks whether the contact was 'possibly prejudicial,' meaning it had a 'tendency' to be 'injurious to the defendant.'" *Godoy*, 861 F.3d at 959 (quoting *Mattox*, 146 U.S. at 150). "If so, the contact is 'deemed presumptively prejudicial' and the court proceeds to step two, where the 'burden rests heavily upon the state to establish' the contact was, in fact, harmless." *Id.* (cleaned up) (quoting *Remmer*, 347 U.S. at 229). And "if the state does not show harmlessness, the court must grant the defendant a new trial." *Id.*

In Brown's notice appealing the order denying his state post-conviction petition, he used the term "incident" and framed the event as being caused by Bush's family harassing, threatening, and eventually attacking his mother on the street, causing her "to have a car crash collision into a pedestrian" and "running into" Bush's sister. (ECF No. 40-10 at 9). Brown repeatedly called it an "accident' in his opening brief in that appeal; he called it a "hit-and-run" once, but qualified it as an "incident" not a crime. (ECF No. 40-15 at 9–11). And he called it an "alleged hit and run," "accident," and "alleged intentional violent act" in his supplemental brief in that appeal. (ECF No. 40-16 at 3–5). Moreover, to show what happened should have been called a crime from the jump, Brown refers this Court to the docket in his mother's state criminal case, not the record before the NCA, and speculation during trial that the collision was purposeful. (ECF No. 64 at 10). This Court finds that NCA's rejection of Brown's ineffective-assistance claim about possible jury bias was not based on an unreasonable determination of the facts under § 2254(d)(2).

The upshot of this analysis is the NCA's rejection of Brown's ineffective-assistance claim about possible jury bias is entitled to deference under AEDPA and *Strickland*. Accordingly, this Court declines to review that decision de novo, denies Brown's request for an evidentiary hearing,[6] and applies deferential review as required. Having done so, this Court finds that NCA reasonably rejected Brown's ineffective-assistance claim on both *Strickland* prongs.

The record supports the reasonable conclusion that there was no basis for trial counsel to inform the trial court about Diamond's specific report of possible jury bias because trial counsel

---

[6] In his reply, Brown asks the Court to conduct an evidentiary hearing, arguing it is unclear from this record whether the State could have discharged its burden to show that the extraneous influence in Diamond's allegations was harmless. (ECF No. 64 at 15). As this Court explained when it denied Brown's motion to conduct discovery on this ground for relief, "the Court's analysis is limited to whether the Nevada Court of Appeals reasonably assessed Brown's claims that his counsel was ineffective under 28 U.S.C. § 2254(d)(1), which entails this analysis is limited to evidence provided to the Nevada Court of Appeals under *Pinholster*." ECF No. 58 at 15. Because § 2254(d) precludes relief on Ground 1(A), Brown is not entitled to an evidentiary hearing on it. *See Pinholster*, 563 U.S. at 203 n.20.

made the tactical decision to generally raise that issue with the trial court rather than possibly expose Brown's character witnesses to bad light if her allegations proved wrong or mistaken. *Cf. Strickland*, 466 U.S. at 690–91 (explaining, in the context of considering counsel's duty to investigate, that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").  The record also supports the reasonable conclusions that there were no bases for trial counsel to further investigate Diamond's allegations or move for a mistrial after the trial court held a hearing on the matter and no juror indicated that they were aware that the traffic incident involved persons associated with Brown's case. *See id.*; *see also Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("failure to take a futile action can never be deficient performance"); *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985) ("[f]ailure to raise a meritless argument does not constitute ineffective assistance").  Accordingly, Brown is not entitled to habeas relief for Ground 1(A).

### B.  Ground 1(B)—trial counsel ineffectiveness on objecting to jury instructions

In Ground 1(B), Brown alleges that his trial counsel was ineffective for failing to object that the self-defense jury instructions misstated Nevada law by wrongly burdening him with having to retreat before asserting self-defense. (ECF No. 23 at 12).  As noted above, the Court found this claim was procedurally defaulted and deferred deciding whether Brown had demonstrated cause and prejudice to excuse the default under *Martinez* until after merits briefing concluded. (ECF No. 58 at 16).  Cause is established here because Brown was *pro se* during the initial state post-conviction proceedings. (*See* ECF No. 62 at 22).  But the Court now determines that Ground 1(B) is not substantial and lacks merit, thus precluding prejudice and therefore excuse of the procedural default of this claim under *Martinez*.

### 1. Relevant law

"Cause" and "prejudice" are satisfied if the petitioner can show that "(1) post-conviction counsel performed deficiently; (2) 'there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different'; and (3) the 'underlying ineffective-assistance-of-trial-counsel claim is a substantial one.'" *Dickinson v. Shinn*, 2 F.4th 851, 858 (9th Cir. 2021) (quoting *Ramirez v. Ryan*, 937 F.3d 1230, 1242 (9th Cir. 2019), *reversed on other grounds by Shinn v. Ramirez*, 596 U.S. 366 (2022)). A claim is substantial if it has "some merit." *Id.* at 858 (quoting *Martinez*, 566 U.S. at 14). And as stated above in Ground 1(A), courts apply the two-part *Strickland* test to determine if trial counsel was ineffective.

### 2. Analysis

Brown alleges that the jury instructions misstated Nevada law because they failed to include NRS 200.120(2)'s direction that "[a] person is not required to retreat before using deadly force in self-defense if the person (a) is not the original aggressor; (b) has a right to be present at the location where deadly force is used; and (c) is not actively engaged in conduct in furtherance of criminal activity at the time deadly force is used." (ECF No. 64 at 16). At the conclusion of trial, the state court instructed the jury on self-defense, including:

Instruction No. 19

The right of self-defense is not generally available to an original aggressor, that is a person who has sought a quarrel with the design to force a deadly issue and thus through his fraud, contrivance, or fault, to create a real or apparent necessity for making a felonious assault.

The original aggressor is only entitled to exercise self-defense, if he makes a good faith endeavor to decline any further struggle before the mortal blow was given.

Where a person without voluntarily seeking, provoking, inviting, or willingly engaging in a difficulty of his own free will, is attacked by an assailant, he has the right to stand his ground and need not retreat when faced with the threat of deadly force.

(ECF No. 37-1 at 20). Brown argues this instruction wrongly burdened him with having to retreat

before using deadly force if he was found to have engaged "in a difficulty of his own free will" by "return[ing] minutes later to talk to or confront [Bush], putting himself in a dangerous situation." (ECF No. 64 at 17).  At bottom, Brown's argument is that the self-defense instructions erroneously permitted the jury to infer that he was an original aggressor and thus not entitled to use deadly force in self-defense without first retreating.  The Court rejects this argument.

The part of Instruction 19 that Brown takes issue with—"[w]here a person without voluntarily seeking, provoking, inviting, or willingly engaging"—is a correct statement of Nevada law.  This language first appeared in *State v. Grimmett*, 112 P. 273 (Nev. 1910), that has somewhat similar facts to Brown's case.  In *Grimmett*, evidence from trial "conclusively prove[d]" that the decedent "was the aggressor in the difficulty, which resulted in the loss of his life, and that it was necessary for the defendant to kill him in order to preserve his own." 112 P. at 273.  Specifically, after the defendant asked the decedent for $7.50 that the defendant claimed the decedent owed him, the decedent "became violently angry, called the defendant a 'hophead' and a 'son of a bitch,' hurriedly removed his coat, threw it on a roulette wheel in the saloon, ran for a billiard cue, and rushed towards the defendant, but was intercepted and the cue taken away from him by bystanders." *Id.*  "Whereupon the decedent immediately ran back of the bar, took a revolver from the drawer, and as he rushed to the end of the bar, revolver in hand, fired one shot at the defendant, whereupon the defendant fired two shots, killing the decedent." *Id.*  In concluding the homicide was justified, the Nevada Supreme Court held:

> The law is well established that where a person, without voluntarily seeking, provoking, inviting, or willingly engaging in a difficulty of his own free will, is attacked by an assailant, and it is necessary for him to take the life of his assailant to protect his own, then he need not flee for safety, but has the right to stand his ground and slay his adversary.

*Id.*

The Supreme Court revisited this rule in *Culverson v. State*, holding "that a person, who is not the original aggressor, has no duty to retreat before using deadly force, if a reasonable person

in the position of the non-aggressor would believe that his assailant is about to kill him or cause him serious bodily harm." 797 P.2d 238, 240–41 (Nev. 1990) (cleaned up).  Unlike *Grimmett*, whether the defendant or the victim was the original aggressor was disputed in *Culverson*. *Id.* at 239.  But like *Grimmett*, the events in *Culverson* unfolded in a continuous encounter:

> Broadus testified that Culverson was the initial aggressor. He claimed that Culverson pulled out a gun, pointed it at Smith and said "give me all of your ... money." Smith said "I ain't giving you ... man" and Broadus pushed Smith out of the car and jumped out himself. As Broadus ran from the scene he saw Smith pointing a gun at Culverson and heard four shots.
>
> Thomas testified that Smith was the initial aggressor. He claimed that when they arrived at Smith's house, Smith and Broadus asked Culverson for a ride somewhere. Culverson said he would need money before he took them anywhere. Smith took out a roll of bills and began to count them. Broadus grabbed Smith's money and stuck it in his mouth. Culverson became angry at Broadus for being "disrespectful" and stated that he was going to take the money back from him. He then told Thomas to let Smith out of the car. Smith got out of the car, pulled a gun out of his pants, and called someone a "s-o-b." Thomas ran. He heard one shot, ran further, and then heard four more shots.
>
> Culverson testified that he shot Smith in self-defense when Smith pointed a gun at him. He further testified that he did not attempt to rob Smith.

*Id.*

Applying this law to the facts of Brown's case, Brown's account supported self-defense and was covered by the instructions if the jury credited his testimony that the events on September 9th were a continuous encounter, i.e., that Brown didn't leave the complex after Bush struck and threatened to kill him but merely walked backward out of Bush's line of sight to a wall near the back gate to arm himself before continuing the encounter and shooting Bush when he again reached like he had a gun.  But unlike *Grimmett* and *Culverson*, substantial evidence adduced at trial reasonably permitted the jury to conclude there were two separate encounters involving Brown and Bush on September 9th.  Specifically, the jury heard testimony from witnesses Templeton and Monroe that Brown left the complex out the back gate after Bush slapped him and returned several minutes later through the front gate and immediately started shooting at Bush who

1    was then seated on the balcony.  These witnesses testified they never saw Bush reach like he had

2    a gun, and they didn't hear him threaten Brown's life.  Additionally, the jury received evidence

3    that physical evidence recovered from the scene was consistent with these witnesses' testimony.

4        So, if the jury credited Brown's version of the events, there was a continuous encounter in

5    which Bush was the original aggressor and Brown reasonably believed that Bush meant to kill or

6    cause him great bodily harm.  In this circumstance, Brown did not have the duty to retreat before

7    using deadly force in self-defense.  This is precisely what Instruction 19 provides.

8        But if the jury credited the State's version, then Bush was the original aggressor in the first

9    encounter who demanded money from Brown and smacked Brown's face when Brown said "no."

10   But Brown did not conclude the encounter by shooting Bush.  Rather, Brown created a second

11   encounter in which he was the original aggressor when he retreated outside the complex, armed

12   himself by removing the gun from a backpack and its own zippered case and putting in the clip,

13   traveled around the complex and reentered it a few minutes later from a different location, and

14   immediately started shooting at the balcony where Bush was seated.  As Instruction 19 provides,

15   Brown had a duty to retreat before using deadly force in self-defense under the State's version.

16       Either version is consistent with some jurors purportedly telling trial counsel after the

17   verdict that the unanimous panel eschewed manslaughter because they found that Brown had a

18   "last clear chance" to avoid using deadly force. (ECF No. 37-12).  As Respondents point out, the

19   jury reasonably could have concluded even based on Brown's testimony that his belief about

20   Bush's capacity for violence was not reasonable.  Relatedly, in affirming Brown's judgment of

21   conviction, NCA held that "[t]he State proved the malice aforethought element" of second-degree

22   murder with use of a deadly weapon "beyond a reasonable doubt" with the evidence presented at

23   trial:

24
25       The jury could reasonably infer from the evidence presented that Brown was guilty
         of second-degree murder with the use of a deadly weapon. The State proved the
         malice aforethought element beyond a reasonable doubt by presenting evidence that

Brown retreated out the back of the apartment complex, was gone for a period of five or more minutes, reentered the apartment complex through the front gates, and immediately fired several shots at Bush from approximately 30-40 feet away. Moreover, the fact that Bush died from a gunshot wound proves the use of a deadly weapon. Although Brown presented evidence that Bush threatened to kill him and that he acted in self-defense when Bush moved as if to draw a gun, the State presented contradicting evidence that Bush was not armed, did not threaten Brown, and did not move as if to reach for a gun. It was for the jury to determine the weight and credibility of this conflicting testimony, and we will not disturb the jury's verdict on appeal where, as here, substantial evidence supports that verdict. *See McNair v. State,* 108 Nev. 53, 56, 825 P.2d 571, 573 (1992).

(ECF No. 38-22 at 4).

The facts in Brown's case are similar to those in *Harkins v. State*, 143 P.3d 706 (Nev. 2006). In *Harkins,* the Nevada Supreme Court concluded that self-defense was not available because "the jury could have reasonably believed that, given the previous altercation" in which the decedent hit and slashed at the defendant with a knife when the defendant said that he tired of their conversation, the defendant, who had retreated to his van and got a loaded gun and donned a latex glove, "was the aggressor" when he returned to the decedent's house with the gun hidden under his shirt. *Id.* at 716. Similar to Brown's case, the decedent made deadly threats and was the original aggressor during the first encounter, telling the defendant he'd kill the defendant's stepson for revealing that the decedent had solicited the stepson to kill the decedent's son. *Id.* at 708.

This Court finds that the self-defense instructions provided in Brown's case were correct statements of Nevada law on the facts in that case. Moreover, Brown's insistence on jury instructions that merely quote applicable statutes is inconsistent with Nevada law. The Nevada Supreme Court instructed in *Runion v. State* that "district courts should tailor instructions to the facts and circumstances of a case, rather than simply relying on 'stock' instructions." 13 P.3d 52, 59 (Nev. 2000). The *Runion* Court "set forth sample instructions for consideration by the district courts in future cases where a criminal defendant asserts self-defense." *Id.* at 58. The instructions provided in Brown's case mirror the language in *Runion*'s samples. *Compare id.* at 59, *with* ECF No. 37-1 at 19–20.

1    Brown points out that *Runion* was decided before the Nevada Legislature amended NRS

2    200.120 in 2011 adding subsection 2, and he argues that case is no longer applicable because the

3    revised statute "directly conflicts with" its sample instructions. (ECF No. 64 at 18).  This Court

4    disagrees.  NRS 200.120(2) simply codified what the Nevada Supreme Court held in *Grimmett*

5    and refined in *Culverson*: that "a person, who is not the original aggressor, has no duty to retreat

6    before using deadly force if a reasonable person in the position of the non-aggressor would believe

7    that his assailant is about to kill him or cause him serious bodily harm." *Culverson*, 797 P.2d at

8    240–41.  And even after the 2011 amendments, the Nevada Supreme Court has not wavered from

9    *Runion*'s direction that jury instructions should be tailored to the facts in each case. *See Kasa v.*

10   *State*, 485 P.3d 750, 757 (Nev. 2021) (citing *Runion* for proposition it was "admonishing district

11   courts to tailor instructions to the case, rather than merely quote applicable statutes").

12    Brown reads too much into NRS 200.120(2)'s "original aggressor," wrongly arguing that

13   term means in the end there can be only one "original aggressor" in every case.  That is certainly

14   true where the evidence conclusively demonstrates there was a single continuous encounter like in

15   *Grummett* and *Culverson*.  But the jury reasonably could have inferred from the substantial

16   evidence adduced at trial that, similar to *Harkins*, there were two encounters on September 9th and

17   Brown was the original aggressor in the encounter in which Bush was shot dead and thus had a

18   duty to retreat before using deadly force under Nevada law. *See* Nev. Rev. Stat. § 200.120(2)

19   (providing that "[a] person is not required to retreat before using deadly force . . . if the

20   person . . . [i]s not the original aggressor").

21    In sum, the jury instructions correctly stated Nevada's law of self-defense as it applied to

22   Brown's case.  Brown has therefore failed to establish deficient performance or prejudice in trial

23   counsel's failure to object to the self-defense instructions, so his underlying claim of ineffective

24   assistance is not substantial.  Accordingly, Ground 1(B) is denied as procedurally defaulted. *See*

25   *Martinez*, 566 U.S. at 14 (explaining the prejudice prong requires a prisoner to "demonstrate that

the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit"); *United States v. Moore*, 921 F.2d 207, 210 (9th Cir. 1990) (explaining that trial counsel's performance was not deficient for submitting a "legally correct" jury instruction).

## IV.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to Brown.  Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a Certificate of Appealability ("COA").  This Court has evaluated the claims within the Petition for suitability for the issuance of a COA.  Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner has made "a substantial showing of the denial of a constitutional right."  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether this Court's procedural ruling was correct. *Id*.  Applying these standards, this Court finds that a COA is not warranted.

## V.    CONCLUSION

**IT IS HEREBY ORDERED** that the First Amended § 2254 Petition, (ECF No. 23), is **DENIED**.

It is further ordered that a certificate of appealability is **DENIED**.

The Court kindly directs the Clerk of Court to substitute Ronald Oliver for Respondent Calvin Johnson, enter judgment, and close this case.

**DATED** this ___23___ day of ____April____, 2025.

_____
Gloria M. Navarro, District Judge
United States District Court